**UNITED STATES of America,**
**Appellee,**

v.

**Joseph F. PINTO, Defendant-**
**Appellant.**

**No. 1104, Docket 74-1202.**

United States Court of Appeals,
Second Circuit.

Argued June 6, 1974.

Decided July 31, 1974.

As Amended Oct. 9, 1974.

---

Joseph A. Faraldo, Kew Gardens, N. Y., for defendant-appellant.

Marshall Tamor Golding, Atty., Dept. of Justice (Edward J. Boyd, V., U. S. Atty., E. D. N. Y., Harold Meyerson, Sp. Atty., Dept. of Justice, on the brief), for appellee.

Before KAUFMAN, Chief Judge, and MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

After a three-day jury trial before Judge Orrin J. Judd of the Eastern District, Joseph F. Pinto was on January 10, 1974, found guilty of committing perjury in violation of 18 U.S.C. § 1623 when he testified before a federal grand jury investigating bribery affecting harness racing as a possible violation of the sports bribery statute, 18 U.S.C. § 224, that he was the owner of a winning "superfecta" ticket which he had cashed for $1,272.00 on March 10, 1973 at a branch office of the Offtrack Betting Corporation (herein "OTB"). Appellant was sentenced to one year in prison, with all but 60 days of the sentence being suspended, and to an additional 18 months on probation. We affirm.

"Superfecta" wagering, as it has been instituted at several harness racing tracks across the country, requires the bettor, in order to win on his wager, to select not only the horse that will win a race but also the horse that will come in second, third and fourth, respectively. While the odds are obviously long, the potential size of the payoff compared to the necessary investment has attracted millions of bettors, many of whom have chosen not to rely on a single prediction alone but to bet on various combinations of horses in every conceivable order of finish which, in the parlance of the track, is generally known as "wheeling" or "boxing" horse combinations. At all times relevant here, OTB offered a "box" superfecta ticket for $72.00. The purchaser of this ticket, which actually encompassed 24 three dollar bets, gained a share of the payoff pool if the four horses he selected were the top four in the race, regardless of which of the four came in first, second, third or fourth.

During the course of its investigation of possible bribery affecting these superfecta races, a federal grand jury sitting in the Eastern District heard evidence that some of the heaviest bettors in the races had remained anonymous by having their winning tickets cashed by several other persons. While OTB kept no record identifying purchasers of superfecta tickets, a person cashing a winning ticket was generally required to give his name to an OTB clerk who completed a form—OTB Form 1099—which was later submitted to the Internal Revenue Service.[1]

On March 10, 1973, appellant entered OTB Branch Office #106 in Queens, New York, and, after a #1099 Form had been completed, received $1,272.00 for a winning $72.00 box ticket on a superfecta race which had taken place two days earlier, on March 8, 1973. Subsequently, on or about August 20, 1973, appellant was called as a witness before the grand jury and he was asked whether he or someone else was the owner of the ticket he cashed. Appellant responded that he, himself, was the owner. He had testified that he had purchased the winning ticket for himself on the day of the race, March 8, 1973, when he had also bought four other losing $72.00 box tickets on the same race. He purchased one of these tickets, he said, because the numbers of the four horses in the combination happened to correspond with the numbers on a sticker on his car and he purchased another of the tickets because the numbers of the horses corresponded with his daughter's

---

1. Completion of this form is required whenever the cash payoff on a $3.00 superfecta bet (24 of which are contained in a $72.00 box bet) is greater than $900.00 or 299 to 1.

birthday. Later, the appellant was arrested for perjury in connection with this testimony but he repeated the same story to a federal agent. He told the agent that he had purchased his one winning and four losing tickets all at one time without interruption on March 8, 1973.

As proof at trial that appellant had lied when giving these answers, the government first introduced the #1099 from which had been completed when appellant cashed his ticket. The form showed that Joe Pinto, 20 Westwood Drive, Huntington, New York, had cashed a winning superfecta ticket which was numbered 567251206275 on March 10, 1973, at OTB Branch #106 in Queens, New York. Michael D. Shagan, an officer of the Security Branch of OTB, explained that every OTB ticket sold, regardless of the amount or type of bet, is numbered consecutively according to the date and window it is sold from.[2] Thus there was only one OTB ticket numbered 567251206275, and in fact, such a ticket had been recovered from an OTB storage box containing all tickets cashed by Branch #106. The ticket, a $72.00 box superfecta ticket, showed on its face that it had been purchased on March 8, 1973, at window 2 of OTB Branch #64 at 88–22 Broadway, Queens, New York, which was the same branch where appellant said he had purchased his ticket. However, whereas appellant had testified that he had purchased his winning ticket with a *group of only five* such box tickets (including four losers), a "Branch Office Bet Report" covering Branch #64, window number 2, showed that ticket number 567251206275 had been purchased as part of a much larger *group of thirty-five* $72.00 superfecta box tickets.

The "Report", a computer printout listing in their proper order the consecutive numbers of all the tickets sold at the window on March 8 and indicating the type of bet—i. e. win, place, daily double, perfecta, exacta, superfecta, etc.—showed that the ticket number 567251206275 was the 19th of thirty-five consecutive $72.00 superfecta bets which were made in *groups of seven* on five different four horse combinations. The combinations were similar and showed a pattern in that all five combinations included the same two horses while all of them excluded two of the others. In the midst of this pattern ticket number 567251206275 was the fifth of seven consecutive bets on the winning combination. Thus the report indicated that number 567251206275, which according to the # 1099 form was the ticket cashed by appellant, was purchased as part of a $2,520.00 wager, probably by a professional gambler rather than by a casual wagerer such as appellant claimed to be. Gladys Lee, who was the OTB seller at window number 2, branch #64, on March 8 testified that she had sold a group of thirty-five consecutive superfecta tickets to one person who made the bets all at one time and that the person making the bets was not appellant Pinto.

In response to a suggestion by defense counsel that a mistake may have been made either manually in copying the number of appellant's winning ticket onto the # 1099 form completed at the time the ticket was cashed or by the OTB computers in issuing the ticket or in the "Bet Report" showing that the ticket was the 19th of thirty-five consecutive $72.00 superfecta box bets, Shagan testified that, in view of the various checks within the system, the odds against such a mistake going undetected

---

2. The first three digits of the ticket number indicate the date the ticket was sold according to the Julian calendar system, the next four digits indicate the OTB computer involved in processing the ticket (which will reveal the branch and window number) and then the eighth, ninth, tenth, and eleventh digits are the sequential number of the ticket sold from the window. The final digit is randomly generated by the OTB computer as a security and control check. Thus ticket number 567251206275 was the six hundred and twenty seventh ticket sold from window 2, branch 64, on March 8, 1973.

were in the range of a "million to one [or] a trillion to one." Shagan testified that a mistake in copying appellant's winning ticket number onto the # 1099 form would have been detected since, according to standard operating procedures, OTB kept all the tickets it cashed in a central storage area, with the tickets cashed by each branch stored in a box labeled with that branch's numbers. Investigation revealed that central storage box # 106 contained only one $72.00 ticket for the March 8 race which had been cashed on March 10 and the number of the ticket was 567251206275. Furthermore, an additional OTB computer report, which was entitled "Branch Office Payouts Made", and which listed all tickets requiring a # 1099 form that had been cashed by OTB branches, indicated that the ticket number 567251206275 was the only winning superfecta ticket for the March 8 race cashed on March 10 at Branch # 106. Finally, Shagan testified that all winning superfecta tickets for the March 8 race had been cashed and accounted for. Since it was necessary for the OTB employee, who actually cashed ticket number 567251206275, to write that number down on the # 1099 form which was prepared at that time, if a mistake had been made OTB would be holding a cashed superfecta ticket without a corresponding # 1099 form. William Weglein, a computer expert employed by the American Totalizer Co., the principal computer company serving OTB, corroborated Shagan's testimony by testifying that in his opinion there was "no way possible for the computer to have erred in either issuing the ticket or producing [the "Bet Report"] that substantiates the sale was made," and further that if a mistake had been made it would have been detected in the normal course of operations.

The only witness called by the defense was Esther Nossov, an OTB clerk who had been employed at Branch # 106 on March 10, 1973 and whose name appeared on ticket 567251206275 as the clerk who cashed it. Her testimony, however, was not particularly helpful to appellant since it did not directly contradict the government's evidence. She testified that she had not prepared the # 1099 form bearing the appellant's name and did not know who had prepared the form. Nor did she recall appellant as having come to her window in Branch # 106 with a ticket to be cashed.

The jury on January 10, 1974, returned a verdict finding appellant guilty of perjury. On this appeal from the judgment of conviction entered on February 1, 1974, appellant argues that he was denied a fair trial and that in any event the district court lacked jurisdiction to try him for perjury in connection with his grand jury testimony since the testimony concerned a matter which the grand jury was without power under 18 U.S.C. § 224 to investigate.

### Discussion

■■ Appellant argues that he was denied a fair trial because (1) his counsel was not given adequate time to prepare for trial (2) the government failed to identify or produce the OTB clerk or branch manager who actually prepared his # 1099 form and (3) the trial court summarized testimony inaccurately and made prejudicial comments in his charge to the jury, which were not based on evidence in the record. The first of these claims is frivolous. Appellant first appeared in court in connection with the perjury charge on August 25, 1973, when he was warned to retain counsel. When he returned on November 8, 1973, still without counsel, the court set trial for January 7, 1974, and warned him again that he should retain an attorney. In light of these warnings and the setting of the trial date two months in advance, the district court's denial of a continuance when appellant's counsel first appeared on January 3, 1974, was clearly within the trial judge's discretion, particularly since no special need

for a continuance was cited.[3] See United States v. Maxey, 498 F.2d 474, 483 (2nd Cir. 1974); United States v. Rosenthal, 470 F.2d 837 (2nd Cir. 1972); United States v. Hall, 448 F.2d 114, 116–117 (2d Cir. 1971). Nor was the government required to identify or produce the OTB employee who prepared appellant's # 1099 form, since the government had no special knowledge as to that employee's identity, or that his testimony would be exculpatory. Compare Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967) with United States v. Ruggiero, 472 F.2d 599, 603–605 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973). Indeed when the government prosecutor did discover the employee's identity after all the evidence had been presented but before the trial court had instructed the jury, he immediately offered to disclose the identity to appellant's counsel, but appellant's counsel showed no interest in pursuing the matter.

 The trial court's charge to the jury is more troublesome. While most of the statements complained of were clearly within permissible bounds,[4] Judge Judd went beyond the evidence in commenting that a possible explanation was highly improbable, as follows:

"If you look at the print-out you find 35 successive $72.00 bets and it is possible that 35 different people came up and made successive $72.00 bets and Mr. Pinto just bought one of the tickets. However, if you look at the variety of bets on this same sheet, there were many more than ten different bets and if you take random selections—which is how you were selected, out of a computer, to come to the jury —and assume even that the average person might make two bets instead of one, the chances of 18 different persons making successive similar bets would be—*I would suppose about one in 10, on each bet, with 18 zeros after it which is more than one in a trillion.* My mathematics may be wrong. Perhaps one of you drew 13 cards of the same suit in a bridge game. You know the possibilities of that." (Emphasis added)

There was no evidence that the odds against 35 or even 18 "people making successive similar bets" were as great as a trillion to one. Under different circumstances such an addition might merit reversal. But in this case appellant's counsel failed to make any specific objection to the charge, which is ordinarily a prerequisite to appellate review. See Fed.R.Crim.P. 30, United States v. Projansky, 465 F.2d 123, 135 (2d Cir.), cert. denied, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1973); United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965) (en banc), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). To be sure, in response to the court's own inquiry after completing his charge as to whether either counsel had any exceptions, counsel for appellant did say, "The only exception I have to your charge is as to the comments on the evidence." However, such an exception is "so general as to be unavailing." See United

---

3. Counsel said only that he needed more time to prepare motions—including a motion to dismiss for lack of jurisdiction—and to prepare a defense. He did not say he needed time to find a computer expert, which is the principal basis of his argument here.

4. For example, appellant complains that instead of saying that Shagan testified that the odds against a manual or computer mistake *going undetected* were in the range of a million or a trillion to one, Judge Judd said Shagan testified that the odds against a manual or computer mistake *being made at*

all were in the range of a million or a trillion to one. In fact, Judge Judd charged:

My recollection of Mr. Shagan's testimony was that he said there are possibilities of errors in a computer but when you consider the various checks and methods of detecting the errors and the relationship between the numbers on the ticket and the numbers on the magnetic drum as reflected on the printout, the chances of error is in relation to one in a trillion and a trillion is a million, million.

This is hardly a material misrepresentation of what Shagan actually said.

States v. Carson, 464 F.2d 424, 432 (2d Cir.) cert. denied, 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1973).

■ Nor do we find that the comment, although unfortunate, was so prejudicial as to constitute "plain error . . . affecting substantial rights," within the meaning of Rule 52(b), Fed. R.Crim.P., Compare United States v. Indiviglio, *supra,* with United States v. Clark, 475 F.2d 240 (2d Cir. 1973) and United States v. Fields, 466 F.2d 119 (2d Cir. 1972). Certainly, proof of Pinto's guilt was overwhelming. According to both Shagan and Weglein, the possibility of computer error was in the neighborhood of one in a trillion, odds which rendered the lack of a sequential ticket purchase by Pinto virtually inexplicable. And, while the probability projections contained in the comment were not supported by any evidence in the record, we can scarcely say they were material exaggerations. Even assuming appellant could show that Judge Judd's estimate of one in a trillion was off by several millions or even billions, the odds against the hypothetical theory of the possible defense being advanced and analyzed by Judge Judd—that several persons might have purchased the 35 consecutive $72.00 superfecta tickets —were obviously infinitesimal. Moreover, while making his calculations, Judge Judd explained that he was only guessing and had no special expertise in the area. Thus this case is distinguishable from Quercia v. United States, *supra,* where the trial court instructed the jury that based on his own expertise in observing ʿmannerisms, he believed the defendant had testified falsely "except when he agreed with the government's testimony." Finally, immediately before and after making his calculations, Judge Judd emphasized that the jurors themselves were the final judge of the evidence. Viewing these instructions as a whole as we are required to do, see, e. g., United States v. Jacobs, 475 F.2d 270, 287–288 (2d Cir. 1973), we do not find that they amounted to a direction to find the defendant guilty, which would call for reversal regardless of the failure to make any specific objection. At the same time we must warn the district court that our action in this case is not to be construed as condoning volunteered instructions of the type found here. For a trial judge to embark upon such unnecessary off-the-cuff remarks poses the obvious risk that under some circumstances they may jeopardize the defendant's right to a fair trial. See e. g., United States v. Clark, 475 F.2d 240, 250–251 (2nd Cir. 1973).

■ Appellant's final argument that he was immune from perjury prosecution with respect to his grand jury testimony since the grand jury lacked power or authority under 18 U.S.C. § 224 to investigate bribery affecting harness racing, cf. Brown v. United States, 245 F.2d 549 (8th Cir. 1957), is frivolous. It rests on the surprising assertion that a harness race is not a "sporting contest" within the meaning of 18 U.S.C. § 224(c)(2) [5] since it involves animals rather than *"individual"* contestants." However, the word "individual" when used as an adjective does not necessary pertain to humans only, see Webster's Third New International Dictionary 1152, and the legislative history manifests a Congressional intent to prohibit bribery of any person who can *influence* sports results. See H.Rep. 1053, 2 U.S.Code Cong. & Admin.News p. 2250 (1964). Furthermore, the drivers who are undeniably "individuals", are an essential part of the contest, which frequently turns on their respective skills.

The judgment of conviction is affirmed.

---

5. 18 U.S.C. § 224(c)(2) provides:

The term "sporting contest" means any contest in any sport, between individual contestants or teams of contestants (without regard to the amateur or professional status of the contestants therein), the occurrence of which is publicly announced before its occurrence.