**UNITED STATES of America,**
**Appellee,**

v.

**Ismael RIVERA, a/k/a "Pequilino",**
**Appellant.**

**No. 580, Docket 74–2115.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 14, 1975.

Decided March 13, 1975.

---

Stanley M. Meyer, Brooklyn, N. Y. (Preminger, Meyer & Light, Brooklyn, N. Y., of counsel), for appellant.

Eugene F. Bannigan, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S.D.N.Y., and Rudolph W. Giuliani and John D. Gordan, III, Asst. U. S. Attys., of counsel), for appellee.

Before LUMBARD, FRIENDLY and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

A three count indictment in the District Court for the Southern District of New York charged Ismael Rivera with the first degree murder of Special Agent Frank Tumillo of the Bureau of Narcotics and Dangerous Drugs (BNDD),[1] with wounding another BNDD agent, Thomas Devine, while effecting or attempting to effect a robbery of money and property

---

1. Under 18 U.S.C. § 1111, murder is in the first degree if "committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery." While that section applies only to murder within the special maritime and territorial jurisdiction of the United States,

18 U.S.C. § 1114 provides that whoever kills various officers or employees of the United States, including any officer or employee of the BNDD, shall be punished under §§ 1111 and 1112.

of the United States, citing 18 U.S.C. § 2114, and of assaulting Devine with a deadly weapon, citing 18 U.S.C. §§ 111 and 1114. Rivera's alleged role in the perpetration of all these offenses was that of an aider and abettor, 18 U.S.C. § 2.

A trial before Judge Knapp and a jury resulted in a mistrial when the jury was unable to agree upon a verdict. At a second trial before Judge Wyatt, the jury returned guilty verdicts on all counts. Judge Wyatt imposed the mandatory sentence of life imprisonment on the murder count, see 18 U.S.C. § 1111, to run consecutively with concurrent terms of imprisonment of 25 and 10 years on the two other counts. Rivera appeals.

### I.

Taking the evidence in the light most favorable to the Government, as we must, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. McCarthy, 473 F.2d 300 (2 Cir. 1972), and omitting, for the time being, the grand jury testimony of Hector Vigo, which will be discussed in Section II, and certain evidence adduced by the Government in response to Vigo's recantation of that testimony at the trial,[2] the facts relevant to this appeal were as follows:

In the latter part of September or early October, 1972, Mabel Salvatierra, a BNDD informer, commenced negotiations with Jose Nieves for the purchase of 10 kilograms of cocaine for $160,000 for her "customers," special agents Frank Tumillo and Jeffrey Hall, who were acting in an undercover capacity. At about the same time, and over the course of a three week period, Nieves, accompanied on a number of occasions by defendant Rivera,[3] met with Vigo and urged him to obtain the cocaine, for which he would receive a $20,000 commission. During the first or second week of October the negotiations terminated without any cocaine being obtained by Nieves or his associates because Nieves had failed to supply the money necessary to complete the transaction.

On October 11, 1972, Nieves, accompanied by Wilson Colon, recruited William Silberberg and his roommate, Pete Diaz, to assist in robbing the purchasers of the $160,000 they were to pay. The robbery was planned for the following day. During the early afternoon of October 11, Artemio Rosa, a long time acquaintance of both Nieves and Rivera, went to Nieves' apartment in Manhattan.[4] Nieves and Rivera were in the apartment when Rosa arrived. While there, Rosa observed several weapons. He testified that two—a long barreled .38 caliber revolver and a silver plated pearl handled small caliber automatic—were owned by and had been brought to the apartment by Rivera.

During the evening of that same day the negotiations between Nieves, BNDD informants Salvatierra and her paramour, Jose Marful, and special agents Tumillo and Hall continued. After Hall showed Nieves a "flash roll" containing $160,000, Nieves, accompanied by the informants and special agents, drove to another location in Manhattan where he made what he claimed were two unsuc-

---

**2.** Also omitted, with the exception of that which is briefly alluded to in Section III, is most of the evidence upon which Rivera premised his defense—the major portion of which consisted of testimony by his wife and relatives concerning the whereabouts of the Riveras on the night of the shooting. Assessment of this testimony was for the jury under the correct instructions which it received. The many inconsistencies in the testimony of defense witnesses which the Government highlighted during the trial afforded ample ground for disbelief.

**3.** Nieves and Rivera were also accompanied on at least one occasion by Jose Matta—who along with Nieves was later killed by BNDD agents after the unsuccessful attempt at robbery—and certain other unidentified individuals.

**4.** Nieves' apartment at 150 Seventh Street between Avenues A and B had formerly been occupied by Rosa, although the latter denied that there was any period of joint occupancy.

cessful attempts to meet with his alleged source; finally, after an alleged phone conversation with the source, he indicated that the transaction had to be delayed until the next evening.[5]

In the early evening of October 12, between about 7:00 and 7:30 p. m., Rosa encountered the defendant in a social club on West 6th Street and engaged him in a brief conversation. A few minutes later, while Rosa was playing the club's jukebox, Nieves and Matta entered the club and spoke with Rivera for about five minutes. At Rosa's request, a few moments later Rivera drove him uptown, and then, after dropping him off, proceeded back downtown. Later that evening, at about 9:00 p. m., Nieves met Silberberg at Colon's bar, La Borocca, and terminated Silberberg's further participation in the planned robbery because Silberberg was "spaced out" on heroin and cocaine.[6] Silberberg testified that; while at the club, Nieves had a conversation with Colon, during which Nieves exchanged a small gun, to wit, the pearl handled automatic Rivera had brought to Nieve's apartment on October 11, for a .38 revolver similar to one later used by Nieves to shoot agent Tumillo, which was recovered directly after the aborted robbery. Shortly before 9:30 p.m. Nieves and Matta were observed leaving a taxi and approaching Salvatierra's apartment. At about 9:30, accompanied by Tumillo and informant Marful, they left her apartment and drove in Tumillo's car to the Sheraton Motor Inn on 42nd Street and 12th Avenue where they met agent Hall, who had already checked into Room 1007. Hall immediately showed them the money, of which there was only $150,000.[7] After they had been allowed to count the money, it was agreed that Nieves and Matta would leave the hotel, obtain the cocaine from their source, and return to meet Tumillo in about two hours in the bar in the hotel lobby. In the meantime, Hall was to rent a second room, where the cocaine was to be deposited after the room key was received from Tumillo; after depositing the narcotics Nieves and Matta were then to return to Room 1007 where they would receive the $150,000 from Hall. As Nieves and Matta were leaving, they rejected Hall's offer of a ride, indicating that "our man" would provide one.

Shortly after 10:00 p. m. Nieves and Matta entered the cocktail lounge located on the fifth floor of the hotel where the bartender served them drinks. Sometime thereafter they were joined by the defendant at the bar, and about five minutes later all three left the lounge.[8]

At around 10:45 p. m. Nieves and Matta were observed entering one of the lobby elevators near the front desk. At approximately the same time BNDD group supervisors Thomas Devine and Ronald Caffrey entered the hotel and proceeding directly to room 1005, the surveillance room, where they joined agents Paul Sennett and Hall, and an informant. Soon after arriving in the

---

5. The Government argued that this inability to contact the alleged supplier was feigned, and was designed to set up the customers for the robbery attempt the following evening.

6. Earlier that day Silberberg's roommate Pete Diaz had died from an overdose of drugs.

7. Hall had removed $10,000 from the flash roll used the previous evening in order to be "realistic" since a bona fide purchaser would have reduced the final payment because of delay in obtaining the cocaine.

8. Rivera was identified by the lounge cocktail waitress who, although testifying that he joined two other men at the bar, was unable to identify the other individuals as being Nieves and Matta. By contrast, the lounge bartender identified Nieves and Matta as having been at the bar, but was unable to identify Rivera as having been the third individual who joined them there. Study of the record has revealed an inconsistency between their testimony in that the waitress said that the three men had been in the bar before 9:00 p. m., while the bartender placed them there at some time shortly after 10:00 p. m. Again, the determination of whose version of the "facts" is correct was for the jury, at least where, as here, the version apparently accepted is not inherently unbelievable and acceptance of the alternate version, that of the waitress, would create time inconsistencies with other witnesses' testimony.

surveillance room, Devine went through the connecting door to room 1007 to join agent Tumillo. At that time Caffrey, from his vantage point in room 1005, observed Tumillo standing by the window with his hands raised above his head. Upon entering room 1007, Devine was confronted by Matta, who was holding a long barreled .38 caliber revolver. In the brief struggle which ensued, the connecting door slammed and locked. After some shooting which resulted in Tumillo's death and serious wounds to Devine's leg and back, first Matta, and then Nieves, were shot and killed while attempting to escape down the hallway.

Immediately after ascertaining Tumillo's and Devine's conditions, Caffrey returned to the surveillance room, picked up the flash roll and left the hotel to report the unexpected events to Agent Hunt. While crossing 12th Avenue he heard, but did not see, a car accelerating from a stopped position in the vicinity of 42nd Street to a high rate of speed. During his briefing of Hunt, Caffrey hailed a New York City Police car and requested the officers to radio for assistance, which they did in a dispatch at 10:53 p. m. At approximately 11:00 p. m., a car driven by defendant Rivera emerged from the Brooklyn Battery Tunnel and struck an automobile being driven by Joseph Caporicci, an off-duty New York City Police officer. When Caporicci approached Rivera's car to exchange registrations, the defendant attacked him. Their brief struggle was joined by James Infantolino, a passenger in the Caporicci automobile, and then interrupted by an officer of the Tunnel Authority. After Caporicci identified himself, the officer requested that they move their cars out of traffic. Caporicci drove his car across the toll plaza, parking it near a retaining wall on the other side of the collection booths. While he was moving his car, Rivera was observed walking near the end of the toll booths where he dropped certain objects that were discovered to be four .38 caliber bullets. Caporicci placed the defendant under arrest and informed Mrs. Rivera, who had been a passenger in the defendant's automobile, that her husband would be taken to the 76th Precinct in Brooklyn and that she should remain with their car or by the side retaining wall until a squad car had arrived from the Precinct. Instead of pulling over and parking, Mrs. Rivera drove away. As this occurred, Caporicci looked inside the car and observed the handle and cylinder of a revolver wedged between the cushions of the passenger seat. The defendant was taken to the 76th Precinct at about 11:25 p. m., where he was subsequently booked on charges of assault, possession of a weapon, and driving while intoxicated. Shortly before 1:00 a. m., Mrs. Rivera arrived at the station and was also placed under arrest for possession of a weapon and leaving the scene of an accident.

Early in the morning of October 13, 1972, Rosa was contacted by Rivera's sister who asked him to provide the defendant with bail money. Later that day the money was provided and on the next day Rosa met Rivera and inquired about the latter's black eye and facial cuts. Rivera replied "[t]hat the Federal agents were after him in the highway and he had an accident with a police car [in] Brooklyn." He also indicated that he had started the fight in order to permit his wife to escape because there was a gun in the car. When asked whether he knew about Nieves and Matta, Rivera answered either that "he was very lucky he had not been killed then" or "he was very luck[y] he had not been killed there."

In January 1973, an investigation was initiated to ascertain whether Nieves and Matta had the assistance of any third party in their attempted robbery. About one month later Rivera contacted Rosa and requested money, informing Rosa that the police were after him and that he had to leave town. Rosa gave the defendant $1,000 that same night. Soon thereafter Rivera departed with his wife and child for Puerto Rico. After living in Puerto Rico under the names of Mr. and Mrs. Ismael Monte from April

through June 1973, they returned to New York City.[9]

Rivera and Frank Torres[10] were arrested on September 28, 1973, by agents of the Drug Enforcement Administration. During an interview later that day, and after being fully apprised of his rights, including his right to remain silent and to a court appointed lawyer if he could not afford to retain one, Rivera admitted knowing both Nieves and Matta, and having been with them earlier in the evening on the day of the shooting. He also acknowledged being Rosa's partner. However, he denied any involvement in the attempted robbery, indicating falsely that he had been in jail at 10:00 p. m. that evening. Prior to arraignment, Rivera was returned to the holding area where he told Torres: "It's a mistake to trust anybody. I told the wrong man." The following day Rivera made a virtually identical comment to his wife. On October 13, 1973, while being lodged at the Federal Detention Headquarters on West Street in New York City, Rivera attacked and beat Rosa. After the incident, he told another inmate that he had hit Rosa because Rosa had "ratted" on him.

## II. *Hector Vigo's grand jury testimony.*

On June 18, 1973, some ten months before the first trial and a year before the second, Hector Vigo testified before a grand jury in the Southern District of New York that two days after the shooting Rivera had said that he had been waiting downstairs in a hotel for Nieves and Matta, that he had fled from the hotel when he heard the shooting, that he believed federal agents were looking for him, and that he was going to leave for Puerto Rico because he was involved in the shooting—"he was downstairs waiting for the guys and then he heard the shooting and he left." However,

when called as a Government witness, Hector Vigo testified, as he had at the first trial, that, although Rivera had come into his bar on two occasions directly after he had learned of the shooting of Nieves, he had never had any conversation with Rivera relating to the shooting. When confronted with his grand jury testimony, Vigo admitted this to be an accurate transcript. However, far from having his recollection refreshed by this, he again claimed the testimony was false; that most of the testimony had been told him by government agents during questioning and the rest he had made up; and that he had been willing to give such false testimony because government agents had threatened that unless he testified as desired, they would take away his children and put his wife and mother in jail. The Government offered the transcript in evidence under the principle announced by this court in United States v. DeSisto, 329 F.2d 929 (2 Cir), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964), and many subsequent cases. Defense counsel specifically stated he had no objection and the evidence was received. In his charge the judge, again without objection, instructed that Vigo's grand jury testimony, if believed, could be considered as substantive evidence, and not merely as "impeaching" Vigo's denial of any conversation with Rivera concerning the latter's involvement in the shooting.

The Government urges us not to consider Rivera's attack on the admission of the grand jury testimony, and the other evidence subsequently adduced by it on the subject of threats, on the ground of lack of objection, United States v. Indiviglio, 352 F.2d 276 (2 Cir. 1965) (*en banc*), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966); United States v. Pinto, 503 F.2d 718, 723 (2 Cir. 1974). Indeed, this may be a

---

9. During this period Rivera telephoned Rosa on a number of occasions to ask for additional money. As a result of these conversations, on one occasion Mrs. Rivera returned to New York where she received $10,000 from Rosa.

10. Torres was arrested for harboring a fugitive. This charge was eventually dismissed by the Government's motion.

stronger case for taking such a course than that presented by either of the cases cited since in *Indiviglio* and *Pinto* a general objection had been raised to the evidence challenged on appeal. However, so far as concerns the basic principle of *DeSisto*, counsel could have considered objection to be futile so far as the district judge or this court were concerned, see United States v. Liquori, 438 F.2d 663, 665 (2 Cir. 1971), and cases there cited, and we shall therefore consider contentions going to the basic principle of *DeSisto* and even to its applicability to Vigo's grand jury testimony. Failure to object to evidence not within *DeSisto* is another matter.[11]

■ We can speedily dispose of Rivera's claims that *DeSisto* is inapplicable to Vigo's grand jury testimony under later decisions of this court. United States v. Cunningham, 446 F.2d 194 (2 Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 302, 30 L.Ed.2d 266 (1971); United States v. Briggs, 457 F.2d 908 (2 Cir.), cert. denied, 409 U.S. 986, 93 S.Ct. 337, 34 L.Ed.2d 251 (1973); and United States v. Pacelli, 470 F.2d 67 (2 Cir. 1972), cert. denied, 410 U.S. 983, 93 S.Ct. 1501, 36 L.Ed.2d 178 (1973), are quite beside the point; we simply refused to *extend DeSisto* to out-of-court statements. Rivera attempts to make something of our remark in *Cunningham, supra*, 446 F.2d at 197–98, that admitting as substantive evidence an FBI agent's testimony to an oral statement which the defendant denied making was improper since introducing "the issue whether the declarant ever made the statement requires resolution of a swearing contest between himself and the police." Those remarks have no bearing whatsoever since the declarant here admitted he had given the testimony, which had been taken by a grand jury stenographer. Indeed, we made this very distinction in *DeSisto* itself, see 329 F.2d at 933–34. Likewise we find no retreat from *DeSisto* in United States v. Insana, 423 F.2d 1165, 1170 (2 Cir.), cert. denied, 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970); when the court there spoke of "our qualification of the hearsay concept set forth in United States v. DeSisto . . .", it was expressing a preference for the qualified form of that concept there announced as against the broader exception for all prior relevant statements, whether inconsistent or not and wherever made, in the Preliminary Draft of the Proposed Rules of Evidence for the United States District Courts and Magistrates to which the court referred, 423 F.2d at 1169; Proposed Rule 801(c)(2)(iv), March, 1969, reprinted in 46 F.R.D. 161, 331.

We likewise see no force in the argument that *DeSisto* is inapplicable where the witness, rather than disclaiming continued memory of the events to which he had earlier testified, asserts that his prior grand jury testimony was false. Indeed this in effect was the situation in *DeSisto* itself, 329 F.2d at 932, although the witness did not characterize his earlier testimony so pejoratively as here and did endeavor to explain it. See also United States v. Klein, 488 F.2d 481, 483 (2 Cir. 1973) (*per curiam*). If the change in testimony is due to fear, it is quite likely that a witness may go beyond disclaimer of continued memory of facts to which he had testified before. We would be all the more reluctant to depart from *DeSisto* since it will shortly rest on authority beyond the power of any federal court to alter, except on con-

---

11. Thus, the court admitted into evidence the signed statement which Vigo had given Special Agent Ferrarone and Detective Robert Sierp of the New York City Police Department. No objection was made to the admission of this document and its use as substantive evidence, despite the fact that such affirmative use would clearly be invalid under prior decisions in this circuit. See, e. g., United States v. Briggs, 457 F.2d 908 (2 Cir. 1972), cert. denied, 409 U.S. 986, 93 S.Ct. 337, 34 L.Ed.2d 251 (1973). In such an instance, as in others discussed in n. 16, *infra*, it is appropriate to rely on defendant's failure to object. Moreover, the information contained in this brief one page document does not go beyond that contained in Vigo's grand jury testimony, and any error in admitting it thus was harmless beyond any reasonable doubt, *cf.* United States v. Pacelli, 470 F.2d 67, 70 (2 Cir. 1972), cert. denied, 410 U.S. 983, 93 S.Ct. 1501, 36 L.Ed.2d 178 (1973).

stitutional grounds. Rule 801(d)(1) of the Federal Rules of Evidence, Pub.L. No. 93-595, 88 Stat. 1926, signed by the President on January 2, 1975, provides the following exception to the hearsay rule:

> Prior statement by witness.—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive . . .

Although the rules take effect on the 180th day after the date of enactment, and apply to all cases brought thereafter, they also are to apply to further procedure in pending cases tried at an earlier date "except to the extent that application of the rules would not be feasible, or would work injustice . . . ." And any basis for constitutional attack seems to be removed by Part II of Mr. Justice White's opinion, joined by four others of the seven participating Justices, in California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). *See also id.* at 154, n. 5, 90 S.Ct. 1930.

The further contention is made that the defendant's case was seriously prejudiced by the substantial evidence which was adduced to dispute Hector Vigo's assertions of threats by the Government to induce him to testify falsely before the grand jury and to show that any threats came from elsewhere.

The first step along these lines was in continuing Vigo's direct examination, where the prosecutor brought out that, prior to testifying before the grand jury, Vigo and his wife had told of threats, veiled or otherwise, that had been directed to them and which were contingent upon whether he did testify—culminating in Vigo's telling the prosecutor "I don't want to be a rat and you can't protect me." However, defense counsel went much further on cross-examination. He elicited testimony from Vigo that a federal agent, Ferrarone, and Detective Sierp of the New York City Police Department had come to see him in The Tombs, where he was confined on a state charge, and had told him that there were twelve people who had heard Rivera say something to him about the killing; that on a second visit they said they would "fix up" the state case if Vigo would "square with them"; that later they took him to then Assistant United States Attorney Phillips' office in the Federal Courthouse and, with Phillips not present, asked him to testify that Rivera had admitted being at the hotel and threatened harm to his children and mother if he did not; and that the conversation with his wife and his statement about not wanting to be a rat came after the grand jury testimony, meant only that Vigo in fact did not want to be a rat, and that he understood "being a rat" to mean "being a liar". The cross-examination concluded on the note that Rivera had never told Vigo anything about involvement with the crime, and that Vigo's only reason for having said the contrary was the threats made by the federal agents to him and his family.

The Government naturally responded. Detective Sierp denied threatening Vigo. He further testified that Vigo changed his mind about testifying at trial directly after a conversation with his wife on February 25, 1974, eight months after his grand jury testimony, in which she told him that she had been asked by neighborhood people whether he was testifying, that she felt her life was in danger, and that she would divorce him unless he refused to testify. Agent Ferrarone similarly denied threatening Vigo and also told of four statements by Vigo with respect to acts or utterances by Rivera shortly before or after the crime. Agent Silvestro, who had been present at a meeting with Phillips, Ferrarone, and Vigo before the latter's grand jury testimony, described in much fuller detail Vigo's four statements concerning Rivera, see n. 16 *infra*; that on that

occasion Vigo said nothing about any threats by federal agents; and that it was only after his grand jury testimony and subsequent conversation with his wife that Vigo indicated he had decided not to testify because he did not want to be a rat and had made up everything because of threats by the agents. Finally former Assistant United States Attorney Phillips testified that at no time had Vigo ever indicated to him that he had been threatened.

In its effort to establish that Vigo's recantation and denial of the truth of the statements he had made to the agents were motivated by his fear for his own life, the Government also called his brother, Robert Vigo, as a witness. He testified that in early January 1974, while he was a prisoner in a detention facility different from the one in which Hector was being held, he learned that some unknown individual was going to kill Hector for testifying and that he wrote a letter to his brother's wife informing her of this; moreover, he said that approximately three weeks prior to the second trial he personally had told Hector about the threat to the latter's life, but that Hector had told him not to worry since he had said nothing.

■ Rivera contends that admission of this testimony deprived him of a fair trial. But the Government could not be expected to remain silent in the face of a claim, vigorously developed by defense counsel in cross-examining Hector Vigo and presumably to be further exploited in summation, that it had procured false testimony by threats—a claim which, if credited by the jury, would have an effect far beyond the destruction of Vigo's grand jury testimony. While greater restraint with respect to Agent Ferrarone's and, particularly, Agent Silvestro's testimony might have been desirable, the defense raised no specific objection to their reciting statements by Vigo of admissions by Rivera concerning his knowledge of and participation in the scheme to "rip off" the agents beyond those contained in Vigo's grand jury testimony

and made no request for an instruction that these not be considered as substantive evidence.[12] It was competent for the Government not simply to deny that threats on its part had led to Vigo's grand jury testimony but also to assert that it was his recantation rather than his grand jury testimony which was due to fear resulting from threats by unnamed third parties. It is immaterial that the Government was unable to prove that the alleged threats came from Rivera, United States v. Franzese, 392 F.2d 954, 961 (2 Cir. 1968), vac. & rem'd on other grounds, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed. 297 (1969). Although the defense would have been entitled to an instruction that there was nothing in any of the evidence adduced to show that Rivera was responsible for the threats, cf. United States v. Scandifia, 390 F.2d 244, 251–52 & n. 6 (2 Cir. 1968), vac. & rem'd on other grounds, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969), Rivera's counsel made no such request, which indeed would have been wholly inconsistent with his objective to convince the jury that the only threats to Vigo came from the Government. In any event, with respect to the testimony of Robert Vigo the court did specifically caution the jury that

> it is not admitted as proof that anybody, in fact, had threatened Hector Vigo, least of all that this defendant, Rivera, or anybody connected with him, had, in fact, threatened Hector Vigo. But it was admitted solely for the consideration of the jury in determining what the frame of mind of Hector Vigo was when he gave testimony here in this courtroom. It was admitted for that purpose and that purpose alone.

III. *Sufficiency of the Evidence.*

■ Rivera's principal argument is that the evidence of his guilt was insufficient to warrant submission to the jury—a question to be determined under the standard we adopted in United

12. See also note 11 *supra*.

States v. Taylor, 464 F.2d 240 (2 Cir. 1972), namely, whether, as said in Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, 232–33, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947), "upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt."

Rivera would have us look at the case as if the evidence of his involvement began only when Agent Caffrey heard the sound of a car "peeling out" from the side of the hotel on the night of the shooting. But there was much more than this to connect Rivera with the interrelated series of events culminating in the murder of Agent Tumillo and the serious wounding of Agent Devine. He had participated in the scheme which began in late September to sell the agents ten kilos of cocaine, to be acquired through Robert Vigo, for $160,000. On several occasions he accompanied Nieves and Matta to meetings with Robert Vigo at which they unsuccessfully urged Vigo to procure the cocaine in exchange for a $20,000 commission; these negotiations terminated during the first or second week of October. Moreover, there was ample evidence from which the jury could conclude that he was aware of the change in the plan from sale to robbery. On the afternoon of October 11 Artemio Rosa went to Nieves' apartment and saw Nieves and Rivera with a number of weapons; two of these were Rivera's and Rosa testified that they had been brought to Nieves' apartment by Rivera. One was a long-barreled .38 caliber revolver similar to the one later used by Matta to shoot the agents; the other was a pearl-handled .25 semi-automatic pistol wich Nieves exchanged on October 12 with Wilson Colon for the .38 caliber revolver he used to shoot Agent Tumillo.

Defendant argues that sellers of large amounts of narcotics often arm themselves to protect their possession of the cash. But Rivera's assistance in procurement of the weapons for the shooting afforded a basis for reasonable inference that more than this was in hand, and the inference became compelling in light of the evidence, referred to before and later, that Rivera very likely knew that the cocaine would not be produced.

Proceeding further, Rivera met with Nieves and Matta on the evening of October 12 at a club on West 6th Street. Only minutes before the shooting he was seen with them in a lounge on the 5th floor of the Sheraton Motor Inn. To be sure, Rivera's identification was by a waitress who could not identify Nieves and Matta, and the latter were identified by the lounge bartender who could not identify Rivera, but this again goes simply to weight.[13] Indeed, the jury could have been favorably impressed by the waitress' refusal to identify Nieves and Matta as contrasted with her persistence in identifying Rivera. Certainly by this time Nieves and Matta knew they were planning a robbery and not a sale, and the jury could reasonably conclude this was discussed; indeed it is a bit hard to see how they could conclude anything else.

Next comes the swift departure of the get-away car, which the jury was abundantly justified in finding to have been Rivera's. Defendant argues that no one would place his wife in a get-away car but that was for the jury to consider. So also was resolution of the conflicting testimony as to the physical possibility of Rivera's making the 5.8 mile journey from the Sheraton Motor Inn near the 42nd Street entrance to the West Side Highway to the toll plaza at the Brooklyn Battery Tunnel late at night in about 10 minutes or less.[14] Rivera's col-

13. See also note 8 *supra*.

14. Defendant contends that it would have been impossible for Rivera to have driven from the hotel to the toll plaza in the interval between the shooting and the accident. Defendant sup-

ported this by the testimony of two cab drivers, who stated that because of the extreme curves and bad surface condition of the West Side Highway, completion of such a journey would take at least 12 minutes. However, the Government offered as its expert a New York

lision with Police Officer Caporicci's automobile, his assault on the officer, his dropping four .38 caliber bullets to the ground, his subsequent denial of ownership of them and his violent remarks to Caporicci clearly permitted an inference of consciousness of guilt.[15] To be sure, this could have been only of participation in an aborted sale but, in light of the evidence that Rivera had known no cocaine was available and had been with Nieves and Matta only a few minutes before the attempted robbery, the jury could reasonably be convinced of a more sinister view beyond a reasonable doubt.

Going on, we find Rivera's remark to Rosa that he was very lucky not to have been killed with Nieves and Matta, which means at least that he had planned to be with them about something, which the jury could have properly found to be a robbery, and his remark that federal agents were chasing him when he hit the police officer's car in Brooklyn. There is also the conversation related by Hector Vigo before the grand jury, where Rivera allegedly admitted having been downstairs in a hotel waiting for Nieves and Matta, that he had fled the hotel when he heard the shooting, and that he intended to leave for Puerto Rico because he was involved in the shooting. About a month after Agent Ferrarone of the Drug Enforcement Administration started an investigation to ascertain whether Nieves and Matta had the assistance of any third party in the attempted robbery, Rivera borrowed $1,000 from Rosa saying that

the police were after him and he had to leave town. Rivera, his wife and child left for Puerto Rico where they remained for three months under assumed names; they also gave false addresses for their residences in New York. After his arrest, along with Frank Torres in September 1973, Rivera not only made the admission as to having been with Nieves and Matta early in the evening of the shooting but was heard to tell Torres, "It is a mistake to trust anybody. I told the wrong man", meaning apparently either Hector Vigo or Rosa. Later, while in the Federal Detention Headquarters, Rivera attacked Rosa, subsequently telling another inmate that Rosa had "ratted" on him.

■■ It can hardly be disputed that this evidence was ample to show that Rivera participated with Nieves and Matta in an unlawful scheme for dealing with the agents. Each one of the facts recited gave color to the others, United States v. Monica, 295 F.2d 400 (2 Cir. 1961), cert. denied, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962); in cases of circumstantial evidence the whole is generally greater than the sum of the parts. See United States v. Bottone, 365 F.2d 389, 392–93 (2 Cir.), cert. denied, 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966). True the evidence did not point with absolute certainty to knowledge by Rivera that the scheme was to rob rather than to sell. But it was sufficient for a reasonable juror, who had seen and heard the witnesses, to be convinced of this beyond a reasonable doubt.[16]

City police officer who had frequently been assigned to the area and who had driven the given distance in four to four and a half minutes without using a siren or police lights.

**15.** Other circumstantial evidence included the revolver which Officer Caporicci sighted through the car window and Mrs. Rivera's driving away from the toll plaza in contravention of the officer's orders.

**16.** This conclusion would become even stronger if we were to take into account certain evidence not heretofore discussed in detail: Some three to four weeks after the shooting Rivera returned to Hector Vigo's bar and told him that just prior to the shooting Nieves and Matta had counted $150,000—not $160,000—

and that the exchange was to take place in a room that had been rented for them—facts otherwise known only to the agents, perhaps the informant Marful, and the two dead robbers; moreover, Rivera had indicated to Vigo that since they didn't have the cocaine, they intended to "rip off" the potential buyers. This evidence was not in Vigo's grand jury testimony but is derived from Agent Silvestro's summary, admitted in response to the defense "threat" contention, of the statements out of court Vigo allegedly made concerning his last encounter with Rivera. While this constituted proper impeachment, it would not be admissible, under our cases cited *supra,* as affirmative evidence that the statements were in fact made by Rivera to Vigo. How-

## IV. Alleged failure to produce Brady material.

Another point raised by Rivera is a claim that the Government failed to supply certain material, potentially relevant to his defense, required by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Before the first trial the Government did turn over a report of Special Agent Ferrarone dated February 8, 1973, stating that he had received information that one Ardemeo Gonzalez was a possible co-conspirator in the shooting. The report said that Gonzalez through his own admission and that of "a close friend, William Silverbird [Silverberg]," who testified as a defense witness, had become involved in the planning stages but became frightened and backed out of the scheme prior to the actual shooting; he was said to have been awaiting the return of Nieves and Matta in an unknown Seventh Avenue address. It was further indicated that he lived at various intervals with his uncle at 245 E. 13 St.

■ The alleged default by the Government was in not telling the defense that Ardemeo Gonzalez and Rivera's "partner", Artemio Rosa, were one and the same person. The Government answers this contention both procedurally and on the merits. Procedurally, it contends that the point was never properly raised below; even assuming that Rivera did not learn of the identity until after the end of the trial, which it disputes, the matter should have been raised by motion for a new trial rather than at sentencing and now on appeal.

Moreover, it cites substantial evidence to show that Rivera knew of the identity all along—to which Rivera has made no answer. We think the Government is right on both grounds.

## V. Applicability of 18 U.S.C. § 2114.

Subsequent to oral argument defense counsel for the first time has questioned whether 18 U.S.C. § 2114, although on its face clearly encompassing the crime for which Rivera was convicted under count II of the indictment,[17] is limited in its applicability to robberies and attempted robberies connected with the Postal Service. The Government has not objected to our considering this—soundly enough since the issue is solely one of law and failure on our part to consider it would simply result in further proceedings in the district court under 28 U.S.C. § 2255 or F.R.Cr.P. 35.

■ Based on an analysis of the statute's legislative history the Ninth Circuit, in United States v. Fernandez, 497 F.2d 730 (9 Cir. 1974), held in accordance with counsel's contention. See also United States v. Spears, 145 U.S.App. D.C. 284, 449 F.2d 946, 951–54 (D.C.Cir. 1971). Prior to Fernandez the Solicitor General of the United States in United States v. Hanahan, 442 F.2d 649 (7 Cir. 1971), vac. & rem'd, 414 U.S. 807, 94 S.Ct. 169, 38 L.Ed.2d 43 (1973) (for reconsideration in light of Solicitor General's position), had conceded that the legislative history showed that the statute was intended to be limited to postal-related offenses.[18] The Government in

ever, for that very reason, there was no excuse for the failure to seek a limiting instruction. So far as concerns sufficiency, there was sufficient evidence without this testimony.

17. Section 2114 provides:

§ 2114. Mail, money or other property of United States

Whoever assaults any person having lawful charge, control, or custody of any mail matter or of any money or other property of the United states, with intent to rob, steal, or purloin such mail matter, money, or other property of the United States, or robs any such person of mail matter, or of any money, or other proper-

ty of the United States, shall, for the first offense, be imprisoned not more than ten years; and if in effecting or attempting to effect such robbery he wounds the person having custody of such mail, money, or other property of the United States, or puts his life in jeopardy by the use of a dangerous weapon, or for a subsequent offense, shall be imprisoned twenty-five years.

18. Prior to the 1935 amendments the statute, then entitled 18 U.S.C. § 320, read:

Whoever shall assault any person having lawful charge, control, or custody of any mail matter, with intent to rob, steal, or pur-

part counters that any resort to the legislative history is inappropriate since the words of the statute are unambiguous. However, the days when the "plain meaning" rule of *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917), was a *vade mecum* for the interpretation of criminal statutes have long since passed. Although there can here be no fair contention of lack of warning such as to make application of the statute offensive on due process grounds, courts should not extend criminal statutes to cases where Congress clearly did not intend them to apply but insufficiently expressed its intent. The "rule of lenity" in applying criminal statutes, see *Bell v. United States*, 349 U.S. 81, 83–84, 75 S.Ct. 620, 99 L.Ed. 905

loin such mail matter or any part thereof, or shall rob any such person of such mail or any part thereof, shall, for a first offense, be imprisoned not more than ten years; and if in effecting or attempting to effect such robbery, he shall wound the person having custody of the mail, or put his life in jeopardy by the use of a dangerous weapon, or for a subsequent offense, shall be imprisoned twenty-five years.

In 1935 the more encompassing phrase "money or other property of the United States" was added. Despite the breadth of the language the legislative history reveals that the amendment was simply designed to remedy an anomaly under the old statute, namely that it imposed a severe penalty on one who robbed mail matter from the Postal Office but none on one who robbed money or other valuable material. This change in the law had been advocated by the Post Office Department, and its purpose was succinctly described by Representative Donald C. Dobbins, a member of the House Committee on Post Office and Roads:

Mr. Speaker, the gentleman from Ohio objects to the 25-year penalty provided in this bill. The penalty clause is not new legislation. If this bill is not passed, the statute will still contain the mandatory 25-year penalty.

The only purpose of the pending bill is to extend the protection of the present law to property of the United States in the custody of its postal officials, the same as it now extends that protection to mail matter in the custody of postal officials. Aside from that, it makes no change in the law. It just includes property of the United States in addition to mail matter which is protected; and let me say there are many custodians of postal stations who have a great amount of

(1955), is an analogy. We thus agree with the Ninth Circuit in *Fernandez* and the position taken by the Solicitor General in *Hanahan* that § 2114 does not apply to the "robbery" of Government monies generally.

The question remains as to the appropriate remedy for this error. Unlike in *Hanahan* where the offense for which the defendant was charged and convicted was in fact covered by 18 U.S.C. § 2112,[19] which does not require a postal nexus, neither that nor any other statute covers the situation here. Although Count II of the indictment charged an assault 'in effecting and attempting to effect' a robbery,[20] thereby leaving open the possibility of conviction

money in their custody but little mail; for instance, in those substations where money orders are sold. If a bandit attacks those employees seeking that money, there is no way to prosecute the bandit under the present law, but if he is merely after a postal card or a letter he can be prosecuted.

I think this makes a salutary change in the law. It is advocated by the Post Office Department and it seems to me there ought to be no objection to it.

79 Cong.Rec. 8205, 74th Cong., 1st Sess. (1935). We do not regard another statement in the floor debate, which the Government has called to our attention, 79 Cong.Rec. 8205, 74th Cong., 1st Sess. (1935) (remark of Rep. Wolcott in response to question by Rep. Truax), as supporting a contrary inference. See also H.R.Rep. No. 582, 74th Cong., 1st Sess. (1935); Sen.Rep. No. 1440, 74th Cong., 1st Sess. (1935).

19. Section 2112 provides:

*Personal property of United States.* Whoever robs another of any kind or description of personal property belonging to the United States, shall be imprisoned not more than fifteen years.

20. On or about the 12th day of October, 1972, in the Southern District of New York, Ismael Rivera, a/k/a "Pequilino", the defendant, unlawfully, wilfully and knowingly, did assault a person, to wit, Thomas Devine, having lawful charge, control and custody of money and property, to wit $160,000, of the United States, with intent to rob, steal and purloin such money and property of the United States, and in effecting and attempting to effect such robbery, did wound and put in jeopardy the life of said Thomas Devine by the use of a dangerous weapon, to wit, a .38 caliber revolver.

under § 2112, the Government concedes that the evidence at trial was limited to showing that an assault was committed during an attempted robbery, which is all that is required under § 2114. The trial court's charge was similarly limited. The simple remedy available in *Hanahan* of remanding for sentencing under the correct statute is thus not available.[21] In these circumstances, where defendant has already been sentenced to life imprisonment for another offense, it would serve little purpose to remand for a full trial on the question of whether the attempted robbery was completed for purposes of sustaining a conviction under § 2112. The conviction as to Count II is reversed and the cause remanded with instructions to dismiss that count of the indictment. The convictions are affirmed as to Counts I and III.

---

**21.** It is settled law that citation of a wrong section of the penal code, not going to the substance of the crime charged, is not ground for dismissal of an indictment, at least where the defendant has not been misled to his prejudice. *See* Fed.R.Crim. p. 7(c); United States v. Cook, 412 F.2d 293 (3 Cir.), cert. denied, 396 U.S. 969, 90 S.Ct. 451, 24 L.Ed.2d 434 (1969).