UNITED STATES of America, Appellee,

v.

Forrest GERRY, Jr. and Richard Perry, Appellants.

Nos. 548, 692, Dockets 74–2100, 74–2106.

United States Court of Appeals, Second Circuit.

Argued Jan. 13, 1975.

Decided March 28, 1975.

Terence M. Brown, Atty., Dept. of Justice, Washington, D. C. (David G. Trager, U. S. Atty., E. D. N. Y., and Peter M. Shannon, Jr., Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Frederick P. Hafetz, New York City (Goldman & Hafetz, New York City, on the brief), for appellant Forrest Gerry, Jr.

Julia P. Heit, New York City (Jacob P. Lefkowitz, New York City, on the brief), for appellant Richard Perry.

Before LUMBARD, FRIENDLY and FEINBERG, Circuit Judges.

LUMBARD, Circuit Judge:

Following an eleven-week jury trial in the Eastern District of New York, the appellants Forrest Gerry and Richard Perry were on May 31, 1974 convicted of influencing the outcome of harness races by bribery (count 1) and of conspiring to do so (count 2) in violation of 18 U.S.C. § 224. The indictment which set forth the charges against Gerry and Perry named twenty-eight individuals as defendants. Of these, two pled guilty;[1] five were severed;[2] the trial judge di-

---

1. Seymour Rothstein, see n.15 & p. 139 *infra* pled guilty prior to trial. Michael Sherman, see n.5 & p. 135, *infra*, was a fugitive at the start of the trial and pled guilty after his arrest.

2. One of those severed, Joseph Pullman, see pp. 142–143 *infra*, received a grant of immunity and testified at trial. After the trial was concluded the indictments were dismissed on motion of the government as to the four other defendants who had been severed.

rected verdicts of acquittal as to five; and, the jury acquitted fourteen. Only the two appellants were convicted.

On July 19, 1974 the appellant Gerry was sentenced to concurrent terms of four years imprisonment on each of the two counts and was fined ten thousand dollars on each count. The appellant Perry was sentenced, also on July 19, 1974, to concurrent terms of two and one-half years imprisonment on each of the two counts and was fined ten thousand dollars.

Perry was sentenced under 18 U.S.C. § 4208(a)(2) with eligibility for parole after six months imprisonment.

As is not surprising after a multi-defendant eleven-week trial, the appellants raise many claims of error. These alleged errors relate generally to (1) the sufficiency of the evidence; (2) the correctness of various evidentiary rulings made by the trial judge; (3) the use, consequences, and implications of tapes surreptitiously recorded at the prosecutor's office; and (4) the propriety of both the prosecutor's summation and the court's charge. We find that none of these claims are substantial and we therefore affirm.

## I. *The Evidence*

The record, viewed in the light most favorable to the government, United States v. McCarthy, 473 F.2d 300, 302 (2d Cir. 1972), reveals a scheme masterminded by Gerry and implemented by Perry and others which operated from January through April 1973 and which had as its purpose the illegal fixing of a specific type of harness race, the "superfecta." A "superfecta" race is a harness race in which there are generally eight horses competing. Its uniqueness does not lie in the way the race is run but in the way that the wagering is conducted on the race. There are basically three types of "superfecta" bets: a three dollar bet; an eighteen dollar bet; and, a seventy-two dollar bet. To win a three

dollar bet the bettor must select the first four horses in the exact order in which they cross the finish line. In the eighteen dollar bet, also known as a "key box," the bettor selects four horses and designates one of the four to finish in first place. The bettor does not, however, have to select the exact finishing order of the other three horses he selects. In the seventy-two dollar bet, also known as a "box bet," the bettor must choose merely the first four horses; he does not have to select any order in which they finish.

A vice president of the Off Track Betting Corporation, Michael Shagan, testified as to the statistical probabilities of winning a "superfecta" bet. He explained that in an eight horse race there were 1,680 possible combinations of four horses finishing in an exact order in the first four positions. Therefore, the odds against winning on a three dollar bet were 1,680 to 1. If, however, a bettor could eliminate one or two horses from his consideration the odds would change dramatically. As Shagan testified, if a bettor were only to consider six horses rather than eight then on a three dollar bet the odds would be reduced from 1,680 to 1 to 360 to 1.

Viewed in another perspective, it would cost $5,040 to place three dollar bets on all possible combinations of four horses in an eight horse race. It would cost half of that amount or $2,520 to place three dollar bets on all possible combinations of four horses in a seven horse race and just $1,080 if only six horses are considered. Since in 1973 the average return for a winning "superfecta" ticket was $3,000, a bettor who could definitely eliminate one or two horses from consideration could afford to bet on all the possible combinations remaining and have a near mathematical certainty of winning more money than he spent on purchasing the wagering tickets.

The attempt to eliminate one or more horses from consideration in the "superfecta" betting formed the basis of the

conspiracy exposed at the trial. Bribery of harness race drivers was the means by which the conspiracy was implemented.

The evidence showed that the appellant Gerry offered bribes to certain race drivers to finish in specified positions, usually in the last four places or "out of the money" in a particular "superfecta" race. Allen Cantor, a harness race driver who was named as a co-conspirator and who testified at trial under a grant of immunity, stated that on January 24, 1973 he had a discussion with the appellant Gerry near Roosevelt Raceway about the "superfecta" race to be run that evening in which he, Cantor, was scheduled to drive one of the horses. Cantor testified that Gerry asked him to "finish out of the super" and told him that if he did so Gerry would give him either a thousand dollars or a ticket on the winning combination. Cantor admitted having told Gerry he would prefer the thousand dollars and he also admitted that he had received $800 from Gerry on the next day, his horse having finished seventh in the "superfecta" race. Another harness race driver, Randolph Perry,[3] also testified to a conversation with Gerry which, though more equivocal than the Gerry-Cantor conversation related above, the jury could reasonably have inferred was an attempt by Gerry to bribe Randolph Perry to finish out of the first four positions.

Having offered bribes to one or more drivers to insure that their horses would be in specified positions, Gerry would then bet large sums of money covering all possible combinations in which those horses were in the appropriate positions. Though Gerry bought a large number of "superfecta" tickets himself, most of the actual placing of the bets was done by Gerry relaying the preferred combinations to other gamblers. One of the other gamblers to whom Gerry relayed the combinations was the appellant Perry.

Perry's relationship with Gerry and his role in the conspiracy was explained by Bruce Cussell, a former employee of Perry's who testified in behalf of the government.[4] Cussell, who was twenty-eight years old at the time of trial, had attended elementary school with Perry and had known Perry "off and on" his whole life. Beginning in February or March 1973 Perry paid Cussell two hundred dollars per week to perform certain services for him. As a daily routine Cussell would bring the New York Times, breakfast and a trotting sheet for the evening's races to Perry's house in Brooklyn where the two of them would wait a call from Gerry. At approximately 11:00 a.m. or noon Gerry would call and during the call Perry, using the trotting sheet Cussell had brought, would make a circle next to the dead horses, i. e., the ones that were not to finish in the first four positions, and make an "x" next to those that should be "keyed." Cussell testified that Perry had told him that he had fixed races with Gerry and that Gerry would contact the drivers and give them either one thousand dollars or a winning ticket.

Following his daily call from Gerry, Perry would according to Cussell's testimony, call Michael Sherman[5] and Peter Vario[6] and relay to them the combinations he had received from Gerry. Perry would then give Cussell between $9,000 and $15,000 which was to be used to purchase tickets on the designated combinations. After purchasing the tickets at an Off Track Betting Office,[7] Cussell would hand the tickets over to Perry and then accompany him to the race track.

When the "superfecta" race had been run Perry would generally pass the win-

---

**3.** The record fails to show any familial relationship between this witness and the appellant Richard Perry.

**4.** Cussell's competency as a witness is discussed at pp. 136–137 *infra*.

**5.** See n.1 *supra* & p. 133 *infra*.

**6.** A co-defendant who was acquitted by the jury.

**7.** During the time period covered in this indictment the Off Track Betting Corporation did conduct "superfecta" betting. It has, however, discontinued this type of betting.

ning tickets on to others to cash since persons cashing winning "superfecta" tickets over $900 are required to complete and verify an Internal Revenue Service form.[8] Occasionally, Gerry and Perry would cash tickets themselves. During the three and one-half months of the conspiracy, January through April of 1973, Gerry was responsible for having placed over one million dollars in bets which resulted in gross winnings of approximately two and one-quarter million dollars.

The defense attempted to establish that a good handicapper could do very well in "superfecta" betting and they called George Levy, President of Roosevelt Raceway, who testified that prior to any indication of wrongdoing he had suggested that the "superfecta" be terminated because he was afraid of what a good handicapper with ample funds could do. The defense also called racing experts who had either been present at or had viewed films of the races that had allegedly been "fixed." These experts testified that they had observed no wrongdoing on the part of the defendant drivers. None of the defendants testified.

## II. Sufficiency of the Evidence

■ The recital of the evidence disposes of Gerry's first claim of error, that the evidence was insufficient. Moreover, Gerry's brief concedes that "viewed in the light most favorable to the government, the evidence against Gerry is sufficient."[9]

Perry claims that the government failed to produce sufficient evidence to establish that he knowingly participated in any bribery scheme and that, excepting the testimony of Bruce Caussell, all that was shown was that he had partici-

pated in a handicapping scheme with Gerry. Perry argues that we should not consider the testimony of Bruce Cussell as he was an incompetent witness. We disagree.

## III. Competency of Witness Cussell

Perry argues that the failure to hold a hearing to determine whether Cussell was a competent witness requires reversal. He does not contend that the fact that Cussell had been a patient at a mental hospital rendered him incompetent to testify as a matter of law. United States v. McFarland, 371 F.2d 701, 705 (2d Cir. 1966), cert. denied, 387 U.S. 906, 87 S.Ct. 1689, 18 L.Ed.2d 624 (1967); 2 J. Wigmore, Evidence § 497 (3d ed. 1940). He does, however, argue that the trial court erred in not holding a hearing to explore the competency issue.

On April 8, 1974, during the trial but prior to Cussell's being called as a witness, a defense attorney asked the Court to conduct a hearing on Cussell's competency to testify. The prosecutor replied that he had received a letter that morning indicating that Cussell was not suffering from any impairment of memory or ability.[10] Later the same day Perry's attorney asked Judge Judd when he should arrange to have a defense psychiatrist present in court for the voir dire examination on Cussell's competency. Judge Judd instructed him to have the psychiatrist present at 2:00 p. m. the following day, April 9, 1974. On the morning of the ninth the government supplied the defense attorneys with a copy of the letter, referred to the preceding day, from Dr. Parlade dated April 5, 1974 which indicated that Cussell's mental condition would not in any way affect his testimony. The defense psychiatrist was apparently never produced that afternoon or anytime thereafter and Cussell

8. The form required to be filed is Internal Revenue Service form 1099. Those cashing winning tickets on a commission basis are often referred to as "ten percenters."

9. Brief for Appellant Gerry at 21.

10. At this point in the trial it was not clear from whom the government received the letter. It later became evident that the prosecutor was referring to a letter from Dr. Parlade dated April 5, 1974.

took the stand on April 15, 1974 without any objection.

Cussell's mental competency and his psychiatric history were fully explored both on direct and cross-examination. He was under psychiatric care and on medication at the time of trial and had a history of mental illness. During cross-examination another request was made to disqualify Cussell on the grounds of mental incompetency. Although the trial judge had not explicitly ruled that Cussell was competent to testify, he had permitted Cussell to take the stand after reviewing the correspondence from Dr. Parlade.[11] Further, when the competency argument was raised on cross-examination, Judge Judd stated that Cussell's answers had been comprehensible and intelligent and that his testimony had been corroborated on many points by the testimony of government agents. From all this we think it readily apparent that, notwithstanding the lack of an express finding, Judge Judd made it clear to all parties that he found Cussell competent to testify.

■■■ The competency of a witness to testify before a jury is a threshold question of law which lies exclusively in the trial court's discretion. United States v. Benn, 155 U.S.App.D.C. 180, 476 F.2d 1127, 1130 (1972). When competency is questioned there is no legal requirement that the trial judge conduct a formal hearing. There must be such an inquiry as will satisfy the Court that the witness is competent to testify but the form of that inquiry rests in the discretion of the trial court. Henderson v. United States, 218 F.2d 14, 17–18 (6th Cir.), cert. denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253 (1955). The trial judge's determination on the question of competency will not be disturbed unless it was "clearly erroneous." United States v. Crosby, 462 F.2d 1201, 1202, 149 U.S. App.D.C. 306 (1972); United States v.

Hardin, 143 U.S.App.D.C. 320, 443 F.2d 735, 737 (1970).

■■■ Having decided to permit Cussell to testify, Judge Judd repeatedly stated both throughout the trial and in his charge that Cussell's credibility was a question for the jury. Once a threshold finding of competency to testify is made by the court, it becomes the function of the jury to determine credibility. United States v. Benn, *supra*, 476 F.2d at 1130. Judge Judd's finding of Cussell's competency as a witness was not clearly erroneous and he properly instructed the jury regarding the determination on Cussell's credibility.

IV. *Alleged Prejudicial References*

■■■ Both appellants argue that the trial court erred in not excluding testimony that alluded to a "fierce mob," a "made man," and a "bookmaker." They contend that the introduction of this testimony was a deliberate attempt by the government to associate them, in the minds of the jurors, with the Mafia and thereby deprive them of a fair trial. We find that when these isolated references are viewed in the context of the testimony during which they were elicited and when weighed in the perspective of an eleven-week trial which produced over ten thousand pages of transcript, the appellants were neither unduly prejudiced nor denied a fair trial.

The reference to a "fierce mob" was made by David Kraft who, on direct examination, testified that from February through April of 1973 he received phone calls from Gerry telling him which horses to bet on in the "superfecta." Kraft relied on Gerry's information because Gerry told him that he could "reach" the drivers. On cross-examination Kraft admitted that he had lost money by betting on Gerry's information and that he felt that he was a "victim of something." Asked if he thought that he was the

---

11. In addition to the April 5, 1974 letter, Dr. Parlade sent another letter dated April 8, 1974 in which he reaffirmed his opinion that Cussell

had no memory impairment and that his mental condition would not affect his testimony.

victim of a "tout" scheme,[12] Kraft replied that he did not believe so. In an attempt to clarify this testimony and to rehabilitate its witness the government, on re-direct examination, sought to bring out the reasons underlying Kraft's belief that it was not a "tout" scheme: first, that too many horses were finishing exactly where they were supposed to; and, second, that according to Joseph Pullman, Gerry was giving the combinations to a guy by the name of Richie in Brooklyn who was connected with the mob and "you just don't tout those kind of people." The government asked for a ruling on the admissibility of this testimony and Judge Judd at first refused to allow testimony about the second reason which related to mob involvement.

When, however, on re-cross examination, Perry's attorney attempted to show that Kraft's testimony about Perry was of recent fabrication, Judge Judd reversed himself and decided that with a limiting instruction the second reason for Kraft's disbelieving that it was a "tout" scheme (i. e., that the mob was involved and no one touts them) was admissible. Both immediately before and after the admission of this testimony the jury was instructed to consider it only to the extent that it related to the state of mind of the witness Kraft and that it was "not to be taken as evidence that anyone belongs to any mob."

The reference to a "made man" occurred during the testimony of Joseph Pullman, an indicted co-conspirator who testified under a grant of immunity. At trial Pullman denied that his grand jury testimony was truthful.[13] The government attempted to refresh his recollection with statements he had allegedly made to agents of the FBI. One of these FBI reports referred to a "Richie" as "the son of a made man in Brooklyn." When asked if he had made such a statement to the FBI, Pullman denied that he had ever in his life called anyone a "made man." Pullman testified that he "wouldn't use those words because made man doesn't mean nothing to me. It could be a businessman that was made, financially." Although Pullman denied knowing the meaning of the term "made man" the appellants argue that the term is well-known and connotes membership in the Mafia.

The third and final alleged "mob" reference to which appellants object, i. e., that Perry was a "bookmaker," occurred during the testimony of Marvin Proman. A groom and trainer, Proman had testified in the grand jury about the bribery of harness race drivers. At trial Proman, like Pullman, denied that he had told the truth to the grand jury.[14] The government attempted to impeach Proman's credibility with prior statements he had allegedly made to the FBI. One of those prior statements, which Proman did not recall at trial, was that Perry was a "bookmaker" from Brooklyn. At the time of this line of questioning, the jury was instructed that the questions were allowed solely to impeach Proman's credibility and that the mere asking of the questions did not justify a finding that the statements made in the questions were true.

Appellants contend that admission of these references to "fierce mob," "made man" and "bookmaker" violated their due process rights by permitting guilt to

---

**12.** The charge to the jury described the questioned "tout" scheme as follows:

"The implication in the cross-examination of Mr. Kraft was that Mr. Gerry was a con artist, who induced his betting clients to pay him money that he represented to be bribes but that he never actually bribed anybody and just put the money in his own pocket."

**13.** The admissibility of Pullman's grand jury testimony is discussed at p. 141 infra.

**14.** After the government had closed but before the defense began, Proman, who had been missing, was located in California and brought back to New York to testify. Judge Judd permitted the government to reopen its case so that Proman could be called. The admissibility of his grand jury testimony is discussed at pp. 141–142 infra.

be established merely by an alleged association with criminal companions, in particular, the Mafia. United States v. Vaught, 485 F.2d 320, 323 (4th Cir. 1973); United States v. Tomaiola, 249 F.2d 683 (2d Cir. 1957). Exclusion of the reference to a "bookmaker" by the trial court would have impermissibly limited the government's right to refresh the recollection of an obviously recalcitrant and recanting witness. Further, it is difficult to see how the use of the term "bookmaker," which does not have any inherent organized crime connotation, could have been unduly prejudicial or shocking in a trial involving allegations of fixing horse races. Finally, the limiting instruction given by the trial court was clear and correct. Even assuming that the jury, unlike this panel, understood the meaning of "made man" that phrase was an integral part of the government's attempt to refresh the recollection of yet another recalcitrant and recanting witness.

The reference to a "fierce mob" poses a greater potential for prejudice than either "bookmaker" or "made man." However, in light of the attempt on cross-examination to show that Kraft was being victimized by a "tout" scheme, the elicitation of the two reasons why Kraft did not believe it was a "tout" scheme appears to have been a reasonable and permissible response by the government. Again, the trial court immediately gave the proper limiting instruction that the testimony was to be considered only as it related to Kraft's state of mind, not as evidence that any of the defendants was a member of any mob. Thus each of the three contested references was properly admitted. We fail to see how any one of them standing alone or all three taken together deprived the appellants of a fair trial. See generally United States v. Polizzi, 500 F.2d 856, 888 n. 54 (9th Cir. 1974); United States v. De Masi, 445 F.2d 251 (2d Cir.), cert. denied, 404 U.S. 882, 92 S.Ct.

211, 30 L.Ed.2d 164 (1971); Carbo v. United States, 314 F.2d 718, 739–40 (9th Cir. 1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964).

## V. Testimony Regarding State of Fear

Another evidentiary ruling challenged by the appellants involved the admission of testimony elicited to impeach a recanting witness' denial of fear. Having pled guilty to one count of the indictment in this case, Seymour Rothstein testified as a government witness on April 23, 1974 and gave testimony damaging to Gerry and other defendants. No defense attorney cross-examined Rothstein. On May 10, 1974 he received a suspended sentence on his guilty plea.[15] Five days later, on May 15, 1974, Rothstein was called as a defense witness. He then stated that much of his earlier trial testimony was false and that he had lied for the government when threatened that otherwise the prosecutor would use his influence to insure that he receive a five-year jail sentence. Rothstein claimed that he had told both the prosecutors and the FBI that he did not know Perry but that he had been forced to testify that he did know him.

The government's response to these allegations was an attempt to show that the recantation was motivated by Rothstein's fear for his own life. On cross-examination by the government Rothstein was asked if he had ever expressed fear for his own "personal safety to anybody during the course of this proceeding." He insisted that he had not. To impeach this denial, Frederick Eder, Rothstein's probation officer, was permitted to testify that in January 1974, two months prior to trial, Rothstein had expressed to him fear for his personal safety. Further, the government was permitted to introduce a memorandum, which had been shown to the witness prior to trial, from Michael Pollack, the chief prosecutor in this case, to the

15. Judge Judd sentenced Rothstein to a term of imprisonment of one year and one day but suspended execution of the sentence and placed Rothstein on probation for three years.

Department of Justice. The memorandum, which was dated February 3, 1974, requested the termination of subsistence payments to Rothstein because he had left the area to which he had been relocated "and returned home, and [could] no longer be considered secure." Both the Eder testimony and the subsistence memorandum were admitted because they impeached Rothstein's denial of fear for his safety.[16]

█ Appellants argue that the admission of this "fear" testimony resolved the trial into a swearing contest in violation of United States v. Cunningham, 446 F.2d 194, 197 (2d Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 302, 30 L.Ed.2d 266 (1971). In *Cunningham* a government witness did not give the testimony injurious to the government's case but he failed to remember certain events and conversations about which the government had expected him to testify. We held that under those circumstances it was improper to call a government agent to testify to conversations he had with the non-remembering witness since "[t]he maximum legitimate effect of the impeaching testimony can never be more than the cancellation of the adverse answer by which the party is surprised," and "where the witness gives no testimony injurious to the party calling him, but only fails to render the assistance which was expected by professing to be without knowledge on the subject, there is no reason or basis for impeachment . . . ." Kuhn v. United States, 24 F.2d 910, 913 (9th Cir.), modified on other grounds on rehearing, 26 F.2d 463, cert. denied sub nom. Lee v. United States, 278 U.S. 605, 49 S.Ct. 11, 73 L.Ed. 533 (1928), cited with approval in both United States v. Cunningham, 446 F.2d

194, 197 (2d Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 302, 30 L.Ed.2d 266 (1971) and Taylor v. Baltimore & Ohio R. R., 344 F.2d 281, 284 (2d Cir.), cert. denied, 382 U.S. 831, 86 S.Ct. 72, 15 L.Ed.2d 75 (1965).

█ The witness Rothstein went far beyond asserting a failure of memory and directly accused the government of forcing him to commit perjury. Under these circumstances, "the Government could not be expected to remain silent in the face of a claim, vigorously developed by defense counsel . . . that it had procured false testimony by threats . . . ." United States v. Rivera, 513 F.2d 519 at 528 (2d Cir. 1975). Further, "[i]t was competent for the Government not simply to deny that threats on its part had led to [Rothstein's direct] testimony but also to assert that it was his recantation rather than his [direct] testimony which was due to fear resulting from threats by unnamed third parties." *Id.* at 528.

█ In addition to their *Cunningham* argument, the appellants contend that the testimony of Eder and the subsistence memorandum were improperly admitted because there was no evidence connecting any defendant to any threat to Rothstein's safety. No such connection need be shown.[17] Rivera, *supra*, at 528; United States v. Franzese, 392 F.2d 954, 961 (2d Cir. 1968), vac. & rem'd on other grounds, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969).

## VI. *Prior Similar Acts*

█ Yet another evidentiary ruling which the appellants claim requires reversal was the admission of prior simi-

---

**16.** Appellants contend that evidence of fear was irrelevant since any fear that may have existed could have been related to a prior loansharking case, a case which this jury was aware of. The existence of another possible cause of fear did not render the fear testimony inadmissible but merely affected its weight.

**17.** The defendants may have been entitled to a limiting instruction that there was nothing in

any of the evidence adduced to show that any of the defendants were responsible for any threats. No request for such an instruction was made either during Eder's testimony or at the time the subsistence memorandum was introduced. United States v. Rivera, *supra*, at 528–529.

lar acts, specifically testimony that in 1965 two of the driver co-defendants had fixed races. The rule in this Circuit as to prior criminal activity is in the inclusionary form and holds that evidence of other crimes is admissible except when offered solely to prove criminal character. United States v. Keilly, 445 F.2d 1285, 1288 (2d Cir.), cert. denied, 406 U.S. 962, 92 S.Ct. 2064, 32 L.Ed.2d 350 (1971); United States v. Deaton, 381 F.2d 114, 117 (2d Cir. 1967). In light of the defense contention that one or two drivers could not fix a race, the testimony that in the past one or two drivers had successfully fixed races was certainly probative. Therefore, when the testimony of these prior similar acts was offered not solely to show criminal character but to show that a race could be fixed by one or two drivers it was admissible with a proper limiting instruction. Such an instruction was given in this case.

■ Gerry relies on United States v. Deaton, *supra*, to argue that it was error to admit testimony that in 1966 his license as a harness race driver was suspended for one week by the New York State Harness Racing Commission for lack of financial responsibility. As discussed above, *Deaton* would mandate exclusion of this testimony only if it were offered solely to show bad or criminal character. The trial court admitted the license suspension testimony because it found that Gerry's financial responsibility had been put in issue by the defense contention that Gerry was "one of the greatest handicappers in the world." While financial responsibility and handicapping skill are not necessarily interrelated, it can not be said that the suspension evidence was admitted solely to denigrate Gerry's character.

## VII. *Prior Grand Jury Testimony of Witnesses*

■ A further evidentiary ruling to which Gerry takes exception permitted the introduction of the prior grand jury testimony of Marvin Proman and Joseph Pullman, both of whom testified at trial and both of whom recanted. Gerry concedes that the prior grand jury testimony of Proman and Pullman would be admissible under our holding in United States v. DeSisto, 329 F.2d 929 (2d Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964), which indeed we adopted with the situation of recantation of grand jury testimony in particular view. He contends, however, that the prior grand jury testimony would not be admissible under Rule 801(d)(1) of the new Federal Rules of Evidence. This argument is based on an earlier version of the Rules. It is inapplicable to the Rules as actually adopted. Rule 801(d)(1) not only adopts but somewhat expands the *DeSisto* rule. The prior grand jury testimony was clearly admissible. See United States v. Rivera, *supra*, at 526–527.

■ Gerry also objects to the admission of Proman's grand jury testimony on the ground that it contained impermissible hearsay statements made by Michael Sherman to Proman. In the grand jury Proman had testified that Sherman gave him money to bribe harness race drivers to finish "out of the money" and that Sherman had told him that the money came from Gerry. It is Gerry's position that for the Sherman statements to be admissible under the law in this Circuit it must first be shown by a fair preponderance of the non-hearsay evidence that Sherman participated in the conspiracy. United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). Assuming solely for purposes of this argument that Gerry's contention is not an unwarranted extension of *Geaney*, we find that there was sufficient nonhearsay evidence to establish by a fair preponderance Sherman's participation in the conspiracy. There was nonhearsay testimony of Sherman's acts which is found in Proman's grand jury testimony; Cussell's testimony as to Perry's daily calls to

Sherman; Lipkin's testimony that he saw Perry in Sherman's motel room; and the record of phone calls from Sherman's motel room to phones listed to Proman and Perry. There was no error in admitting Proman's grand jury testimony as to Sherman's declarations.

## VIII. *Other Evidentiary Rulings*

██ Perry alleges that he was impermissibly prejudiced by a ruling of the trial court which allowed FBI Agent Sean Hilly to testify to a post-conspiracy admission Hilly overheard Gerry make to Kraft. Perry claims that in a joint trial the introduction of Gerry's admission violated his sixth amendment right to confrontation. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). We find this contention to be without merit since the admission contained no reference to any other defendant and since the jury was properly instructed that the testimony was received only against Gerry. See United States v. Trudo, 449 F.2d 649, 651–53 (2d Cir. 1971), cert. denied, 405 U.S. 926, 92 S.Ct. 975, 30 L.Ed.2d 799 (1972).

██ Gerry and Perry assign as error the introduction of the testimony of the mathematician, Dr. Yaspan, and the numerous charts and graphs used to establish betting patterns. They claim that this evidence was not probative on the question of bribery as it permitted the jury to convict them on the basis of probabilities, possibilities and mathematical speculation. See Tribe, Trial by Mathematics, 84 Harv.L.Rev. 1329 (1971). While there may have been an overkill in the mathematical, statistical, and graphic evidence introduced in this case, certainly sufficient evidence of actual bribery was adduced to refute the contention that the jury verdict was based on mathematical probabilities and not on actual evidence of bribery. In any event, this testimony was introduced for purposes of meeting defendants' argument that Gerry's apparent success was attributable to his handicapping skills and the judge gave appropriate cautionary instructions to remind the jury that Gerry's skills as a handicapper reflected his special knowledge of the field and not simply a mechanical application of a rule excluding horses bearing the longest odds.

## IX. *Prosecutor's Conversations with Witness; The Pullman Tapes*

In addition to their claims of error relating to the sufficiency of the evidence and the various evidentiary rulings discussed above, appellants claim that the trial judge's handling of the problems arising out of a surreptitious taping of conversations held at the prosecutor's office was so prejudicial as to require reversal. Joseph Pullman, an indicted co-conspirator whose case had been severed prior to trial, had given testimony in the grand jury that was most damaging to Gerry and other defendants. After his grand jury testimony but prior to his being called at trial, Pullman, on April 16, 1974, met with Gerry's attorney and agreed surreptitiously to tape his interview sessions at the prosecutor's office. During the trial, on April 18, 19 and 21, 1974, Pullman went to the office of the Brooklyn Strike Force with a hidden taping device. While Pullman was allegedly present at the Strike Force office to prepare for his forthcoming testimony, the tapes reveal that his real purpose in being there was deliberately to draw the prosecutors and government agents into making damaging statements. The fact that Pullman had taped his interview sessions was not immediately revealed, apparently because Pullman hoped to receive a grant of immunity before his taping activities were made known to the government. When Pullman was finally called at trial he denied the truth of his grand jury testimony and claimed that he had been coached in the grand jury by the prosecutor.

The tapes recorded by Pullman contain some unfortunate statements made by both the prosecutors and government agents. When, however, the defense ar-

guments relating to the Pullman tapes are shorn of their rhetoric they resolve into the following contentions: (1) that the government suborned perjury on the part of the witness Kraft and then lied to the court about this alleged subornation; (2) that the court below erred in not ordering Kraft recalled as part of the government case; (3) that the court below erred in requiring the preparation of a transcript of the tapes as a prerequisite to their being played; (4) that statements on the tapes called into question the integrity of the trial judge and he should have declared a mistrial; and, (5) that the court's statements concerning the legality of the taping prejudiced Gerry.

■ On Friday, April 19, 1974, a day on which Pullman wore a recording device in the prosecutor's office, David Kraft had been cross-examined by the defense attorneys and was expected to resume his testimony on the following Monday. As discussed above in relation to his testimony concerning a "fierce mob," Kraft had been asked whether he believed that he was the victim of a "tout" scheme. That evening at the Strike Force office Kraft discussed his testimony with government agents. At one point in this discussion FBI Agent Fanning asked: "All right, do you think he was touting Richard Perry? and the Vario's? Do you think he was touting the Vario People." Based on this question the appellants argue that the government was suborning Kraft to commit perjury. We find that a reading of the transcripts fails to support this charge. Indeed, the question asked by Fanning, when viewed in the context of the entire conversation, appears to have been nothing more than an honest attempt to discover why Kraft didn't believe that there was a "tout" scheme.

We also find no merit in the allegation that the prosecutor, Michael Pollack, deliberately lied to the court as to the date on which he discussed with Kraft possible avenues of rehabilitation. Pollack admitted that he had spoken to Kraft on

Friday, April 19, 1974, but that the meeting was chaotic and he did not receive a satisfactory response until Monday, April 22, 1974. Pollack volunteered that "for me, Friday through Monday is one day." While the tapes show a more extended Friday conversation between Pollack and Kraft than Pollack's statements may have led one to expect, Pollack was correct in stating that there were many other people milling about and that the meeting was rather chaotic. Further, there is no reason for Pollack to have misled the court as to whether he spoke to Kraft on Friday or Monday as it was clearly a collateral issue of no significance.

■ The appellants' second argument arising out of the Pullman tapes is that after the existence of the tapes was made known the court erred in not ordering Kraft recalled as part of the government case so that he could be subjected to further examination based on the tapes. The decision as to when a witness is to be recalled rests in the sound discretion of the trial court. United States ex. rel. Nelson v. Follette, 430 F.2d 1055, 1059 (2d Cir. 1970), cert. denied, 401 U.S. 917, 91 S.Ct. 899, 27 L.Ed.2d 818 (1971). While it might have been wiser to permit Kraft to be recalled, we find no abuse of that discretion in this matter. Gerry's attorney obtained possession of the Pullman tapes while Kraft was a government witness. The decision not immediately to divulge the existence of the tapes and then use them in examining Kraft was a tactical decision. In any event, as the court pointed out, defendants had the opportunity to call Kraft during the presentation of their cases.

■ The appellants also argue that the trial judge could not condition the playing of the tapes on the preparation of an accurate transcript. This was a decision which rested in the sound discretion of the trial court and, again, we can not say that there was an abuse of that discretion. The judge's insistence on the preparation of a transcript, based in part

on his difficulty in understanding the tapes, was both clearly and consistently made known to the defense counsel. The judge himself provided counsel with a rough transcript of all the tapes. Thus he did more than he was required to do. See United States v. Frazier, 479 F.2d 983 (2d Cir. 1973).

 It is contended by Gerry and Perry that statements contained on the tapes called into question the integrity of the trial judge and he was obligated *sua sponte* to declare a mistrial. Statements made by both the prosecutor and government agents relating to the prosecutor's influence over the trial judge in the matter of sentencing were both deplorable and unprofessional. It was indeed indiscreet for the prosecutor to inform Pullman that the trial judge had supported him in obtaining admission to the bar. However, a full reading of the transcripts shows that Pullman was pressing further and further to elicit damaging statements and that although the prosecutor claimed to have some influence with the judge, he did make it clear that no assurances could be given as to what the judge would ultimately do on sentencing. In any event there was no obligation on the part of the trial judge to declare a mistrial or dismiss the indictment.

 The appellants' last contention arising out of the Pullman tapes is that the trial court's statements concerning the legality of the making of the tapes unduly prejudiced Gerry. After the existence of the tapes was made known to the jury, the defense requested an instruction that there was "nothing illegal or wrong or criminal" in Pullman's making the tapes. The judge did not give the requested instruction and stated in the presence of the jury: "I'm not sure about that." He added: "Well, by saying I am not sure, doesn't mean it's wrong. It means I am not sure it is

right." The next morning the judge formally instructed the jury that there was no law that prevented the making of the tapes and that the propriety of their having been made had no relationship to the guilt or innocence of any of the defendants. There was no prejudice to the defendant Gerry in these instructions.

## X. *Prosecutor's Summation*

 Appellants' final claim of error relates to the propriety of both the prosecutor's summation and the court's charge. In particular, Gerry objects to the prosecutor's discussion of Proman's disappearance prior to trial and the speculation that he was being supported by Gerry during this period. We find that these comments did not transgress the "broad limits" within which "counsel for both sides are entitled to argue the inferences which they wish the jury to draw from the evidence." United States v. Dibrizzi, 393 F.2d 642, 646 (2d Cir. 1968).

## XI. *Charge of the Court*

 The charge delivered to the jury was a fair and full statement of the law and gave proper guidance to the jury. The judge would have been better advised to omit certain statements, particularly a comment on his interest in why Pullman insisted on receiving a grant of immunity rather than pleading guilty and "tak[ing] his chances on the sentence I might impose." While this and other statements in the charge were unnecessary and unfortunate, we do not believe that they resulted in any prejudice to the appellants. Cf. United States v. Pinto, 503 F.2d 718, 724 (2d Cir. 1974).

We have considered the other claims of the appellants and find them to be without merit.

The judgments of conviction are affirmed.